UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

——

MELVIN BARHITE, Jr.,

                    Plaintiff,                    Case No. 1:14-cv-218

v.                                          Honorable Paul L. Maloney

C.C. BROWN et al.,

                    Defendants.

_____/

## OPINION

      This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131 *et seq.*, and the Rehabilitation Act (RA), 29 U.S.C. § 791 *et seq.* The Court has granted Plaintiff leave to proceed *in forma pauperis.* Under the Prison Litigation Reform Act, PUB. L. NO. 104-134, 110 STAT. 1321 (1996), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim against Defendants Brostoski, Mackie, Marran, Horton, Norton, O'Brien, Schram, Smith, Theut, Trierweiler, the

unknown hearing investigator at Chippewa, and the unknown librarian at Chippewa.  The Court will allow service of the complaint, in part, on the remaining Defendants, as set forth herein.

## Discussion

### I.    Factual allegations

Plaintiff Melvin Barhite, Jr. is a state prisoner incarcerated by the Michigan Department of Corrections (MDOC).  At the time of filing the complaint, he was housed at E.C. Brooks Correctional Facility (Brooks), though the events at issue in the complaint occurred while he was housed at Parnall Correctional Facility (Parnall), Carson City Correctional Facility (Carson City), Chippewa Correctional Facility (Chippewa), and Alger Correctional Facility (Alger).  In this action, Plaintiff sues the following MDOC employees, in their official and individual capacities: (1) from Parnall, Deputy Warden C.C. Brown, Medical Unit Manager C. Ives, and an unidentified first shift sergeant on March 29, 2012 ("Unknown Party #1"); (2) from Carson City, Deputy Warden Laura Krick and Nurse Practitioner Victoria Marran; (3) from Chippewa, Warden J. Woods, Deputy Wardens (Unknown) Horton and (Unknown) Mackie, Hearing Officers (Unknown) Theut and (Unknown) O'Brien, Resident Unit Manager (Unknown) Norton, Property Room Officer (Unknown) Smith, an unidentified hearing investigator ("Unknown Party #2"), and an unidentified librarian ("Unknown Party #3"); and (4) from Alger, Grievance Coordinator W. Trierweiler and Assistant Resident Unit Supervisor (Unknown) Schram.  Plaintiff also sues the following current/former employees of Corizon: Nurse Practitioner Lynette O'Connor, who worked at Parnall, and Dr. (Unknown) Brostoski, who worked at Chippewa.

Plaintiff's allegations in this action primarily concern two issues: (1) inadequate prison conditions and accommodations for his physical/medical needs; and (2) the deprivation of his

personal property.  Plaintiff also makes a variety of allegations about other issues, including:  the rejection of prison grievances and outgoing mail, the denial of requests for paper, the deprivation of supplies/equipment for his leg braces, and inaccuracies in his prison record.

## A.  Prison Conditions

Plaintiff asserts that he suffers from a number of chronic health conditions, including: diarrhea, diabetes, abnormal urination, hypertension, and hyperlipidemia.  Also, he is impaired in the use of his hands and legs due to a "late effect" of acute poliomyelitis.  (Compl., docket #1-1, Page ID#11.)  Because of his health conditions, Plaintiff uses a wheelchair, walks with leg braces and forearm canes, wears an undergarment, eats from a special menu, and sometimes needs a typewriter for written communication.  Prior to the events at issue in the complaint, Plaintiff was evaluated at the MDOC's healthcare facility ("DWHC") in Jackson, Michigan, to determine which special accommodations were necessary for him.  (*Id.*)  Plaintiff asserts that he would have been placed in the "ongoing medical unit" at DWHC, also known as "C-Unit," but that unit has very few "barrier free, wheelchair accessible" cells.  (*Id.*)  Instead, Plaintiff was placed at Parnall, where he could be housed in a cell containing both a sink and a toilet, and remain close to the healthcare facilities in Jackson, Michigan.

In October 2011,[1] while he was incarcerated at Parnall, he was sexually assaulted by a MDOC employee who is not a defendant in this action, Dave Sumner.  Plaintiff allegedly filed grievances about the assault,[2] and two months later, MDOC personnel started to "whitewash" his

---

[1]In one part of the complaint, Plaintiff's asserts that the assault occurred in October 2012, but reading his complaint as a whole, the assault must have occurred in October 2011.  Plaintiff was not incarcerated at Parnall in October 2012, as he was transferred to another facility seven months earlier.  (Compl., Page ID#13.)

[2]Plaintiff eventually filed a civil rights lawsuit against Dave Sumner in August 2012, in the Eastern District of Michigan.  *See Barhite v. Sumner*, No. 4:12-cv-13722 (E.D. Mich.).

file, which means that they started removing from his prison record some of the special medical accommodations that had been ordered for him.[3] (*Id.* at Page ID#12.)  On February 22, 2012, Nurse O'Connor allegedly changed his file to remove his accommodations for a special diet, a handicap table, frequent laundry, forearm canes, "Grabber and Shoe Horn," catheters, and "Brace Boots." (*Id.* at Page ID#13.)

On March 13, 2012, Plaintiff asked Deputy Warden Brown to "fix the problem with Dave Sumner or move Plaintiff [from Parnall] to another facility, like C-Unit, w[h]ere Plaintiff could have Barrier Free Wheelchair Accessible housing" as required by the special accommodations in his file. (*Id.*)  Within an hour, "barrier free" was removed from his list of special accommodations. (*Id.*) Plaintiff claims that Defendant Brown worked with Nurse O'Connor and Medical Unit Manager Ives to change his medical accommodations.  According to Plaintiff, removing special accommodations from a prisoner's file makes it possible to transfer the prisoner to a facility that cannot provide those accommodations.  Plaintiff claims that Defendants wanted to move him to another facility in retaliation for "seeking justice" about the assault by Sumner. (*Id.* at Page ID#14.)

On March 29, 2012, Plaintiff was sent to the transfer center at Parnall to await transfer to another facility.  Transport staff arrived with a bus and informed officials at Parnall that Plaintiff could not be transported because the bus did not have a wheelchair lift.  The sergeant on duty,

---

[3]Per MDOC Policy Directive 04.06.160 ¶ E (effective June 30, 2008):

Whenever a prisoner is identified as having a medical condition which restricts his/her ability to function adequately in the institutional environment, a qualified health professional shall identify reasonable options available in a corrections setting which will meet the prisoner's special medical need.  Options may include prosthetics, medical supplies, assistive devices (e.g., wheelchairs, canes), medical treatment, or restrictions on activities, placement, or housing.  Options also may include the issuance of non-wool blankets, extra blankets or sheets, special mattresses, or special shoes.  The recommended option(s) shall be set forth on a Medical Detail if expected to be temporary (i.e., six months or less) or on a Special Accommodation Notice if expected to be long-term (i.e., more than six months) or permanent.

Unknown Party#1, disagreed.  He wheeled Plaintiff to the door of the bus and ordered Plaintiff to climb aboard.  To comply, Plaintiff had to pull himself backwards up the bus stairs, one step at a time.  He then pulled himself across the floor and up into a seat.  Plaintiff was then taken to St. Louis Correctional Facility, where he was helped out of the bus and into his wheelchair, and then forced to pull himself up into the seat of a mini-van.  MDOC officers then took him to the medical center at Carson City.

After he arrived at Carson City, medical staff informed Plaintiff that they could not provide him a special diet because Carson City did not have a diet line.  In addition, Plaintiff learned that he would be housed in an 8-man cell that is not barrier-free or wheelchair accessible, and that lacks a "wheelchair shower" and "wheelchair toilet."  (*Id.* at Page ID#16.)  After learning this information, Plaintiff refused to go to his cell.  Plaintiff received a misconduct ticket for his refusal and he was placed in segregation.

On April 3, 2012, Plaintiff received a hearing on the misconduct charge.  By this time, he had been deprived of a "medical menu" for four days and he had "run out" of pills for his diarrhea.  (*Id.* at Page ID#17.)  Plaintiff explained to the hearing officer that Carson City could not house him because the special accommodations that he needed were not available at that facility. The hearing was adjourned to investigate that issue.  On April 10, 2012, the hearing officer determined that housing Plaintiff at Carson City "would cause Plaintiff harm and . . . would endanger his physical condition."  (*Id.*)  Plaintiff was found not guilty of the misconduct.

A deputy warden at Carson City told Plaintiff that staff would try to move him to another facility.  A nurse practitioner at Carson City, Defendant Marran, revised Plaintiff's list of special accommodations, ostensibly in order to make the move possible.  Specifically, she noted that

he is wheelchair "permanent" instead of wheelchair "distance only." (*Id.* at Page ID#18.) Also, Deputy Warden Krick increased Plaintiff's security level from Level I to Level II,[4] because the MDOC did not have barrier-free, wheelchair-accessible housing with an in-cell sink and toilet at Level I. The Assistant Resident Unit Supervisor (ARUS) at Carson City reviewed Plaintiff's security classification and determined that Level I was appropriate, but Krick increased it to Level II, stating that he needed access to "medical/mental health treatment." (*Id.* at Page ID#19.)

On April 17, 2012, Plaintiff was transferred from Carson City to Chippewa.[5] By that time, Plaintiff had been in segregation at Carson City for 17 days without "needed medical care and equipment," and he had lost control of his bowels, soiling his undergarments. (*Id.* at Page ID#20.) Upon arrival at Chippewa, he was searched and then taken to the medical center. He asked for a clean undergarment, but his request was refused. He was told that he would see a doctor the next day. An inmate took Plaintiff to the Level II housing unit (called "Marquette Unit"), and Plaintiff went to his cell and then to the showers. Along the way, Plaintiff noted a number of aspects about the facility that did not comply with the ADA 2010 Standards for accessible facilities, including: raised walking surfaces, improper distances between doors, improper door hardware, a single elevator for a unit containing eighteen wheelchair cells, an overly-steep wheelchair ramp, insufficient maneuvering clearance at the entrance of his cell (he had to remove his footrest to enter), no turn-around space inside his cell, no knee or toe space under his desk, an upright footlocker that is not accessible, inadequate space for transferring to and from his bed, no wheelchair-accessible toilets

---

[4]In the MDOC, security classifications, from least to most secure, are as follows: Levels I, II, IV, V, and administrative segregation. MDOC Policy Directive 05.01.130 ¶ B (Nov. 10, 2011).

[5]Chippewa is located in the "Upper Peninsula" of Michigan, and is far from Plaintiff's family. (Compl., Page ID#21.)

in the unit bathroom, insufficient floor space for approach to the urinals and sinks in the bathroom, insufficient floor space to enter the "transfer type" showers that have a seat inside the shower, and no "roll-in" shower.  (*Id.* at Page ID##23-24.)

Apparently, Plaintiff was able to take a shower, and after he finished, he was taken to the dining hall, where he discovered that there were no "wheelchair tables" at which he could eat. (*Id.* at Page ID#25.)  His only options were to sit between two seats at a square table, with the corner of the table "pushed between his gut," or to sit at a round table with his wheelchair blocking the walkway.  (*Id.*)  Plaintiff later learned that there is one wheelchair table in the corner of the room, but officers often use it to hold their cups of coffee, which means that an inmate wishing to use the table must first request permission from the officers.  Also, sitting at that table results in the wheelchair blocking the walkway.

That evening, Plaintiff returned to his cell.  He had not yet received any of his personal or medical property, so he was forced to "reuse" a full undergarment during the night.  (*Id.* at Page ID#26.)  At "count time" the next morning, Plaintiff asked to go to the bathroom, but an officer told him to stay in his cell.  (*Id.*)  After the count finished, Plaintiff was allowed to go to the bathroom to wash himself and his underwear.  Plaintiff later went to the unit officer's desk to ask permission to go to the medical unit and get a new undergarment, but his request was denied. Plaintiff refused to return to his cell, so he was issued a Class I misconduct for disobeying an order.[6] He was taken to the medical unit and given medical supplies and new undergarments, and then

---

[6]Under MDOC Policy Directive 03.03.105 (Apr. 9, 2012), a Class I misconduct is a "major" misconduct and Class II and III misconducts are "minor" misconducts.  *Id.* ¶ B.  Plaintiff asserts that the misconduct in his case would have been a Class II misconduct, but an officer charged him with a Class I misconduct on the basis that "TO MOVE INMATE WILL CAUSE HARM TO INMATE OR STAFF."  (Compl., docket #1-1, Page ID#28.)

placed in a segregation cell containing both a sink and a toilet.  Also, he started receiving his medical diet.

On April 25, 2012, Hearing Officer Theut held a hearing regarding the misconduct charge against Plaintiff.  Plaintiff explained his medical needs and concerns about the facility, and the hearing was adjourned.  At another hearing on April 27, 2012, a statement was submitted from Dr. Brostoski, who asserted that Marquette Unit has wheelchair-accessible cells and that "[Plaintiff] MAY FIND A SINGLE MAN CELL MORE CONVENIENT BUT THERE IS NO MEDICAL NEED FOR A SINGLE MAN CELL."  (*Id.* at Page ID#29.)  Based on Dr. Brostoski's statement, Officer Theut found Plaintiff guilty of the misconduct and required Plaintiff to serve ten days in segregation.

On May 10, 2012, Plaintiff was released from segregation and ordered to return to his unit.  Plaintiff agreed to do so because he decided that it would be better to remain in his housing unit than be sent to segregation.  The ARUS told Plaintiff that he reviewed Plaintiff's security classification and determined that Plaintiff should be housed at Level I security.  Warden Woods allegedly refused to approve a lower security classification, however, because there were no cells available in Level I for an inmate in a wheelchair.  Over the next several weeks, Plaintiff filed grievances complaining about "handicap[] violations," and staff responded by harassing him and calling him names.  (*Id.* at Page ID#31.)  Plaintiff asked for a transfer to another unit/facility, but his request was denied.

On June 30, 2012, after two months of "trying to make the best of bad housing" and enduring unidentified harassment from staff, Plaintiff asked for protection from "first shift" staff in Marquette Unit.  (*Id.*)  He was then placed in segregation and issued a Class II misconduct ticket

because he refused to return to his cell.  On July 9, 2012, he was found guilty of the misconduct and

given a 30-day loss-of-privileges sanction.  For the next two days, however, Plaintiff was kept in

segregation.  At the time, he believed that his continued segregation was for his protection, in

response to his request.  At the end of the two days, however, he was ordered to return to his cell.

He refused to do so because he did not want to return to Marquette Unit and because his detention

cell was more appealing than the cell in his housing unit.  He received a Class I misconduct ticket

for his refusal.[7]

On July 17, 2012, Hearing Officer O'Brien held a hearing on the Class I misconduct

charge.  Officer O'Brien determined that Plaintiff was not being held in segregation for his

protection, and that Plaintiff had disobeyed an order.  He found Plaintiff guilty of the charge and

ordered that Plaintiff serve ten days in segregation.  That same day, Plaintiff received a security

classification hearing before Deputy Wardens Mackie and Horton.  Defendant Mackie warned

Plaintiff that if he did not return to Marquette Unit after release from segregation, he would be

considered a "management problem" and be re-screened to security Level IV.  (*Id.* at Page ID#34.)

On July 27, 2012, Plaintiff again refused to return to his unit, and he received another

Class I misconduct ticket.[8]  At the misconduct hearing on August 6, 2012, Officer Theut found that

Plaintiff was not credible regarding his assertion that the housing unit is not wheelchair accessible.

Officer Theut found Plaintiff guilty of the misconduct and required him to serve an additional seven

days in detention.  At a security classification hearing on August 13, 2012, Deputy Wardens Mackie

---

[7]Again, the misconduct ticket was for a Class I misconduct because "A FORCED MOVE COULD CAUSE HARM TO INMATE OR STAFF."  (Compl., Page ID#33.)

[8]Again, the misconduct was raised to a Class I misconduct because "A FORCED MOVE COULD CAUSE HARM TO INMATE OR STAFF."  (*Id.* at Page ID#35.)

and Horton again told Plaintiff that if he did not return to Marquette Unit, he would be reclassified to Level IV security.

On August 15, 2012, Plaintiff refused to return to his unit.  Officer O'Brien found Plaintiff guilty of a Class I misconduct on August 21, and ordered that Plaintiff serve an additional ten days in detention and lose privileges for 30 days.  On August 27, 2012, Defendants Mackie and Horton held another security classification hearing and Mackie told Plaintiff that he is a security Level IV inmate.  Later that day, an officer told Plaintiff to pack up his belongings for transfer to the Level IV housing unit (called "Round Unit").  Plaintiff refused to do so, in part, because a wheelchair-bound inmate in that unit recently had been beaten to death by his cell mate.  Also, Round Unit is not wheelchair accessible.

Plaintiff received another misconduct ticket, and on September 4, 2012, Officer O'Brien found him guilty of a Class I misconduct and ordered him to serve another ten days in detention.  Three days later, at another security classification hearing, Defendant Mackie "[made] it very clear [that] Plaintiff will go to Round Unit, or die at Marquette.  Plaintiff will never get moved to another facility. 'NEVER.'" (*Id.* at Page ID#37.)  Plaintiff claims that other prisoners who refused to be housed in Marquette Unit or Round Unit during this time, but who were not disabled, were transferred to other prisons.  On September 14, 2012, Plaintiff refused to pack up his belongings in order to move to the Level IV unit.  He was given a misconduct ticket, but the ticket was dismissed by Hearing Officer Theut on September 26, 2012, because Plaintiff argued that the misconduct hearing was not timely.

-10-

One hour after dismissal of the charge, Plaintiff was ordered to pack up his belongings to go to Round Unit, and again he refused.  On October 3, 2012, Officer Theut found Plaintiff guilty of a misconduct, and he ordered Plaintiff to serve an additional 30 days in detention.

On October 5, 2012, Plaintiff returned to his cell and noticed that the complaint he was preparing to file in the instant action had been moved and some of the pages were mixed up. Two days later, on October 7, 2012, Resident Unit Manager (RUM) Norton came to Plaintiff's cell holding a copy of the complaint.  Apparently, prison staff had taken Plaintiff's legal documents from his cell and made a copy of them.  With the complaint in hand, RUM Norton "explode[d]" and declared that Plaintiff "would never go home"; he would "die in prison."  (*Id.* at Page ID#40.)  Two days later, Plaintiff was told to pack up his property, and then the following day, Plaintiff was transferred to Alger.  The staff at Alger placed Plaintiff in Level II, in a single-person cell with a sink and a toilet; Plaintiff claims that it was a "much less FAKE" wheelchair accessible cell, at a "much less FAKE wheelchair accessible barrier free facility."  (*Id.* at Page ID#41.)

### B.  Property

When Plaintiff was housed at Parnall, he possessed the following property, all of which, he claims, was allowed by MDOC policy for a Level I inmate: a television, a typewriter, a duffel bag containing personal property, a footlocker containing personal property, three footlockers containing legal materials, four boxes that also contained legal materials, and a bag of medical supplies.  When he was transferred to Carson City, his property was placed in that facility's property room, and it remained there until Plaintiff was transferred to Chippewa.  Plaintiff's property followed him to Chippewa, but he was not given access to it because he was placed in segregation the day after his arrival.

### 1. *Personal property*

On April 18, 2012, Property Room Officer Smith unsealed and inspected Plaintiff's personal property.  He also unsealed ten of Plaintiff's typewriter ribbons, which caused them to dry out and rendered them useless.  Officer Smith prepared a notice of contraband removal identifying Plaintiff's television, typewriter, duffel bag, and one footlocker as contraband.  Smith allegedly told Plaintiff, "When I'm done you['re] going to be glad to have a half a duffel bag of property."  (*Id.* at Page ID#48.)

On May 10, 2012, RUM Norton held a hearing regarding the contraband personal property.  He did not allow Plaintiff to see his property, nor did he list the items that were contraband, in violation of prison policy.  Instead, Norton simply determined that most of the property was contraband.  Plaintiff asserts that the property should have been held in storage so that his family could pick it up.  By the time that he was transferred to Alger, however, the property had disappeared.

### 2. *Legal property*

Officer Smith also unsealed Plaintiff's legal property and prepared a notice of contraband removal for all of that property, claiming that Plaintiff needed a legal hearing to justify its possession, though Plaintiff asserts that his legal property complied with policy.  On May 15, 2012, five days after Plaintiff was released from segregation, a hearing investigator notified him that there would be a hearing regarding his legal property.  The next day, Hearing Officer O'Brien held a hearing and determined that Plaintiff would have to order four new footlockers because the metal clasps on his current lockers had been damaged and were coming off.  (*See* Compl., Page ID#50.)

Plaintiff was told that he would have to wait until his new footlockers arrived before he could access his legal property.

After the new footlockers arrived, Deputy Warden Mackie told Plaintiff that he would not be allowed to keep them in his cell.  Instead, they would be kept in storage, and Plaintiff would be allowed to access them one time per month, after submitting a written kite request.  When Plaintiff requested access to his footlockers, however, he was told by "first shift" staff, "I'm not the property room office, go to your cell," or "[Y]ou['re] on LOP [status] go to your cell," or "Tell me just what you want, I'll get it for you, if I can find it."  (*Id.*)  In other words, according to Plaintiff, he was not given access to his legal property.

After Plaintiff returned to segregation on June 30, 2012, he again requested access to his legal property.  At a security classification hearing, Deputy Warden Mackie told staff to give Plaintiff access for two hours, two days in a row.  Except for that one occasion, Plaintiff was never given access to his legal property while he was at Chippewa.

### 3.  *Medical property*

Officer Smith sent Plaintiff's medical property to the medical unit.  Dr. Brostoski determined that Plaintiff did not need his leg socks or the dressing that he wears under his leg braces.  Also, Dr. Brostoski took Plaintiff's shoes and wheelchair gloves.  At the hearing before RUM Norton on May 10, 2012, Norton stated that he would put Plaintiff's personal property, including his medical property, in the trash.

### 4.  *Other personal property*

In addition to the personal property identified as contraband or destroyed by Defendant Smith, Plaintiff contends that other property was lost or destroyed by staff at Chippewa.

For instance, Plaintiff's walker was sent from Parnall to Chippewa by Deputy Warden Brown. Later, when Plaintiff arrived at Alger, he was told that his walker was gone. In addition, an officer at Chippewa confiscated a tape player from Plaintiff. It should have been held in storage so that Plaintiff's family could pick it up, but about a week later Plaintiff received notice that it was to be destroyed.

Plaintiff further claims that he possessed two book readers at Chippewa, a cassette player and a digital player. When he was released from segregation, he was given access to his players, but he was told that he must bring them to the library for inspection once per week and that he could only keep two books at a time. Plaintiff alleges that non-disabled prisoners are not required to have their book players inspected. On June 30, 2012, when Plaintiff requested protection from staff at Chippewa, the players went missing. Someone found them, but then the librarian took them to the library. When Plaintiff was transferred to Alger, both players were lost.

In addition, while he was at Chippewa, Plaintiff received a package from his family. When staff packed up his property for transfer to Alger, the package was not listed on his property form. Plaintiff filed a grievance about the issue, but apparently it was denied. In response to the grievance at step I of the grievance review process, RUM Norton allegedly "violated policy and lied." (*Id.* at Page ID#53.) At step II of the grievance review process, Warden Woods allegedly "violated policy and lied." (*Id.*)

Finally, when Plaintiff was moved from Level II housing to Level IV housing at Chippewa, the RUM at Chippewa (presumably, Defendant Norton) confiscated some of his property. That property never made it to Alger.

-14-

### C.  Other Issues

#### 1.  *Prison grievance process*

Plaintiff asserts that he attempted to resolve the loss of his property through the prison grievance process.  Grievance Coordinator Trierweiler initially told Plaintiff that he should grieve all issues regarding the loss of his property in one grievance.  After Plaintiff filed his grievance, however, Trierweiler rejected it because it stated more than one issue.  Plaintiff attempted to appeal this decision to step II of the grievance review process, but Trierweiler rejected it and refused to file it, telling Plaintiff that he needed to rewrite his grievance.  Also, Plaintiff attempted to send a grievance in the mail to Chippewa regarding an incident occurring at that facility.  His mail was rejected due to insufficient funds, even though MDOC policy provides that inmates are to be loaned funds for sending mail to another facility.

#### 2.  *Paper*

Plaintiff asserts that he is indigent and can obtain carbon paper from the library by completing a disbursement form.  However, when Plaintiff asked the ARUS for paper, she refused, stating that he is not indigent.

#### 3.  *Letter*

Plaintiff alleges that he tried to send a letter to the library in Lansing, postage-free, by marking it "FREE MATTER FOR THE BLIND AND HANDICAPP."  (*Id.* at Page ID#56.) Mailroom staff at Alger told him that he could not send it in that fashion.

#### 4.  *Health / medical supplies*

Plaintiff asserts that he could not use his leg braces because the boots given to him by the medical staff at Alger did not work with his braces.  He also contends that the state-issued

underwear provided for him at Alger was too big to hold his sanitary pad in place, so urine leaked out of the pad and down his leg.  Plaintiff asked for Hanes-brand underwear, the kind he had used at Chippewa.  The quartermaster and the medical unit at Alger did not grant his request.  Plaintiff experienced a similar problem in 2009, while he was incarcerated at G. Robert Cotton Correctional Facility (Cotton).  Defendant Ives, the medical manager at Cotton at the time, would not order absorbent pads for Plaintiff.  Instead, the nurse would cut out a "blue [p]ad," which "leaked all the time." (*Id.* at Page ID#57.)  Plaintiff eventually developed an infectious sore on his leg as a result.  The sore has since been treated, but he now has "MRSA" living in his body.  (*Id.*)

## 5. *Prison record*

Plaintiff contends that his prison record, which is reviewed by the Michigan Parole Board to determine whether to grant parole, is "full of lies," but Defendant Schram refuses to correct it. (*Id.* at Page ID#58.)  For instance, the record states that Plaintiff has received thirty-seven misconducts, but most of them are due to his refusal to be housed in "non[-]handicap[] housing." (*Id.*)  Also, the record contains conflicting information about Plaintiff's juvenile history.

## D.  Claims / Relief

Based on the foregoing allegations, Plaintiff asserts that Defendants have violated his rights under the ADA, the RA and the Constitution.  Plaintiff also asserts that Defendants' conduct (*e.g.*, changing his medical accommodations, forcing him to crawl onto a bus, increasing his security level, sending him to a facility that is far from his family, and refusing to correct errors in his prison record) is a form of retaliation for the fact that he complained about being sexually assaulted by a prison officer.  (*See id.*)  As relief, Plaintiff seeks a declaratory judgment, an injunction, and compensatory and punitive damages from each Defendant.  Plaintiff's request for injunctive relief

includes the following: (1) transfer to barrier-free, wheelchair-accessible housing that does not violate state or federal law and that does not "restrict his visitation" in violation of the ADA; (2) placement at his "true"security level; (3) all misconducts related to "handicap[] or medical" purged from his file; (4) a new parole hearing based on his corrected record, with notice to the parole board that his file has been corrected; (5) future security level increases to be accompanied by clearly stated reasons for the increase; and (6) medical treatment at a level of care comparable to that outside the prison, with treatment for "Post Polio" by someone who treats that condition. (*Id.* at Page ID#59.)

## II.     Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the

mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

### A.  42 U.S.C. § 1983

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996).  Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). Section 1983 does not provide redress for a violation of a state law. *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995); *Sweeton v. Brown*, 27 F.3d 1162, 1166 (6th Cir. 1994).  Thus, to the extent that Plaintiff alleges merely a violation of state law or prison policies, he does not state a § 1983 claim.

### B.  ADA

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The term "qualified individual with a disability" includes "an individual with a disability who, with or without . . . the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or participation in programs or activities provided

by a public entity." 42 U.S.C. § 12131(2).  To state a claim under Title II of the ADA, Plaintiff must

show that (1) he is disabled under the statute; (2) he is otherwise qualified for the program, services

or activities of the public entity; and (3) he is being excluded from participation in, or denied the

benefits of, the program, services or activities by reason of his disability, or is being subjected to

discrimination by reason of his disability.  *See S.S. v. E. Ky. Univ.*, 532 F.3d 445, 453 (6th Cir.

2008).  The proper defendant under a Title II claim is the public entity or an official acting in his or

her official capacity.  *Carten v. Kent State Univ.*, 282 F.3d 391, 396-97 (6th Cir. 2002).  Title II does

not allow for damages against a public official acting in his or her individual capacity.  *Everson v.

Leis*, 556 F.3d 484, 501 n.7 (6th Cir. 2009).

       The ADA "validly abrogates state sovereign immunity" for "conduct that *actually*

violates the Fourteenth Amendment[.]"  *United States v. Georgia*, 546 U.S. 151, 159 (2006).  If

conduct violates the ADA but not the Fourteenth Amendment, then the Court must determine

whether the ADA validly abrogates state sovereign immunity.  *Id.*  At this stage of the proceedings,

the Court will assume that the ADA abrogates state sovereign immunity for Plaintiff's ADA claims.

## C.  RA

       The RA provides, in pertinent part:

> No otherwise qualified individual with a disability in the United States . . . shall,
> solely by reason of her or his disability, be excluded from the participation in, be
> denied the benefits of, or be subjected to discrimination under any program or
> activity receiving Federal financial assistance . . . .

29 U.S.C. § 794(a).  A "program or activity" includes the operations of "a department, agency, . . .

or other instrumentality of a State . . . ." 29 U.S.C. § 794(b)(1)  The requirements for stating a claim

under the RA are substantially similar to those under the ADA, except that the RA specifically

applies to programs or activities receiving federal financial assistance.  By accepting these funds, states waive sovereign immunity from claims under the RA.  *Nihiser v. Ohio EPA*, 269 F.3d 626, 628 (6th Cir. 2001).  For purposes of this Opinion, the Court will assume that the MDOC receives federal assistance for the prison programs and activities at issue.

In addition, the RA provides that any discrimination be "solely" by reason of the plaintiff's disability, which is slightly stricter than the standard in the ADA.  *See* 29 U.S.C. § 794(a).  Also, like the ADA, the RA does not impose liability on individuals.  *Lee v. Mich. Parole Bd.*, 104 F. App'x 490, 493 (6th Cir. 2004).  Because the statutes are so similar, the Court will assume that where Plaintiff states an ADA claim, he also states an RA claim.  *See Thompson v. Williamson Cnty.*, 219 F.3d 555, 557 (6th Cir. 2000) ("Because the ADA sets forth the same remedies, procedures, and rights as the Rehabilitation Act . . . claims brought under both statutes may be analyzed together."); *Andrews v. Ohio*, 104 F.3d 803, 807 (6th Cir. 1997) ("Because the standards under both of the acts are largely the same, cases construing one statute are instructive in construing the other."); *see also Owens v. O'Dea*, No. 97-5517, 1998 WL 3440, at *2 (6th Cir. May 27, 1998) ("Congress has dictated that Title II of the ADA be interpreted in a manner consistent with section 504 of the RA.") (citing 42 U.S.C. §§ 12134(b), 12201(a)).

III.    Defendants

A. Deputy First Shift Sergeant ("Unknown Party #1")

A sergeant at Parnall ("Unknown Party #1") allegedly forced Plaintiff to crawl onto a bus that did not have a wheelchair lift.  The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes.  Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency."  *Rhodes v. Chapman*, 452 U.S. 337,

345-46 (1981).  The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346).  The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600-01 (6th Cir. 1998).  The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted).  "Not every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479-80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)).  Plaintiff does not allege that Defendant subjected him to an objectively serious risk of harm.  Thus, he does not state an Eighth Amendment claim against Defendant.

Plaintiff also contends that Defendant's actions were a form of retaliation for Plaintiff's complaints about Dave Sumner.  Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).  In order to set forth a First Amendment retaliation claim, a plaintiff must establish that:  (1) he was engaged in protected conduct; (2) an adverse action was taken against him

that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.* It is well recognized that "retaliation" is easy to allege and that it can seldom be demonstrated by direct evidence. *See Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005); *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987). "[A]lleging merely the ultimate fact of retaliation is insufficient." *Murphy*, 833 F.2d at 108. "[C]onclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state . . . a claim under § 1983.'" *Harbin-Bey*, 420 F.3d at 580 (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538-39 (6th Cir. 1987)); *see also Murray v. Unknown Evert*, 84 F. App'x 553, 556 (6th Cir. 2003) (in complaints screened pursuant to 28 U.S.C. § 1915A, "[c]onclusory allegations of retaliatory motive with no concrete and relevant particulars fail to raise a genuine issue of fact for trial") (internal quotations omitted); *Lewis v. Jarvie*, 20 F. App'x 457, 459 (6th Cir. 2001) ("bare allegations of malice on the defendants' parts are not enough to establish retaliation claims" that will survive § 1915A screening).

Plaintiff's retaliation claim against Defendant is wholly conclusory. Plaintiff does not allege any facts to support plausible conclusion that Defendant forced him to crawl onto a bus because Plaintiff objected to conduct by another officer. Thus, Plaintiff does not state a retaliation claim, or any other claim under § 1983, against the unidentified first shift sergeant at Parnall. On the other hand, the Court concludes that Plaintiff's allegations are adequate to state a discrimination claim under the ADA/RA.

### B. Nurse Marran

Defendant Marran allegedly revised Plaintiff's list of special accommodations to state that he is wheelchair "permanent" instead of wheelchair "distance only." Plaintiff does not indicate

how this change impacted him, and the import of Marran's change is unclear.  Indeed, Plaintiff himself professes ignorance as to its meaning.  (*See* Compl., docket #1-1, Page ID#18 ("Plaintiff don't understand this one.  You use a wheelchair, or you don't.").)  Plaintiff implies that Marran changed this accommodation in order to allow him to be moved from Carson City to another facility, but he provides no allegations to support this conclusion.  On its face, "permanent" is a more expansive requirement than "distance only."   It is difficult to conceive how expanding the accommodations that Plaintiff requires could have made it easier to transfer him to another facility.  Moreover, Plaintiff's primary complaint regarding his transfer is that the facility to which he was sent could not meet his need for barrier-free, wheelchair-accessible accommodations.  If anything, the change made by Defendant Marran underscores that need, and thus, it not apparent how her conduct could have played a meaningful role in his transfer or otherwise adversely impacted him.  In the absence of allegations from which to infer that Marran's actions caused Plaintiff any meaningful harm, let alone violated his constitutional rights or subjected him to discriminatory treatment because of his disability, Plaintiff does not state a claim against her.

### C.  Deputy Warden Krick

Plaintiff states that Defendant Krick increased his security level in order to transfer him to a facility with a wheelchair-accessible cell, because the MDOC does not have barrier-free, wheelchair-accessible cells in Level I.  As to Plaintiff's claim under § 1983, Plaintiff does not have a constitutional right to be incarcerated in a particular facility or to be held in a specific security classification.  *See Olim v. Wakinekona*, 461 U.S. 238 245 (1983); *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976); *Meachum v. Fano*, 427 U.S. 215, 228-29 (1976).  The Sixth Circuit has followed the Supreme Court's rulings in a variety of security classification challenges.  *See, e.g., Harris v.*

*Truesdell*, 79 F. App'x 756, 759 (6th Cir. 2003) (holding that prisoner had no constitutional right to be held in a particular prison or security classification); *Carter v. Tucker*, 69 F. App'x 678, 680 (6th Cir. 2003) (same).

Plaintiff asserts that Krick's conduct was a form of retaliation for complaining about the sexual assault by Dave Sumner.  (*See* Compl. ¶ 64, docket #1-1, Page ID#19.)  Plaintiff merely alleges the ultimate fact of retaliation by Defendant Krick, however.  He has not presented any facts to support his conclusion that she retaliated against him for any protected conduct.  Indeed, according to Plaintiff, she increased his security level to accommodate his need for a wheelchair-accessible cell (because the MDOC did not have wheelchair-accessible cells available at Level I), not because of any protected conduct.  Thus, he fails to state a retaliation claim against her.

On the other hand, the Court concludes at this stage of the proceedings that the allegations suffice to state a claim against Defendant Krick under the ADA/RA.  *See* 28 C.F.R. § 35.152(b)(2) (prohibiting public entities from "plac[ing] inmates or detainees with disabilities in inappropriate security classifications because no accessible cells or beds are available," "[u]nless it is appropriate to make an exception").

### D.  Hearing Officer Theut

Defendant Theut allegedly found Plaintiff guilty of Class I misconducts on April 27, 2012, August 6, 2012, and October 3, 2012, in each case, because Plaintiff did not comply with orders to return to his cell.  In addition, on September 26, 2012, Theut dismissed a similar misconduct charge against Plaintiff after Plaintiff notified him that the misconduct hearing was not timely.  For the first misconduct conviction before Defendant Theut, he ordered that Plaintiff be confined in segregation for ten days.  For the second, he ordered confinement for seven days.  For

the third, he ordered confinement for 30 days.  Plaintiff acknowledges the conduct on which his convictions were based, but he apparently contends that Theut should have found him innocent because he had good reasons for not returning to his assigned cell (i.e., his cell allegedly violated ADA requirements).  In addition, he contends that Theut's 30-day sanction in October 2012 was issued in retaliation for Plaintiff's complaint about the timeliness of the September 2012 hearing.

The Court notes that Plaintiff does not have a constitutional right to avoid confinement in segregation. *See Harden-Bey v. Rutter*, 524 F.3d 785, 795 (6th Cir. 2008) ("'Because placement in segregation is a routine discomfort that is a part of the penalty that criminal offenders pay for their offenses against society, it is insufficient to support an Eighth Amendment Claim.'") (quoting *Murray v. Evert*, 84 F. App'x 553, 556 (6th Cir. 2003)); *see also Hewitt v. Helms*, 459 U.S. 460, 468 (1983) ("[A]dministrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration.").

In some circumstances, a prisoner's confinement in segregation triggers the protections of due process.  In *Sandin v. Conner,* 515 U.S. 472 (1995), the Court held that a prisoner's loss of liberty implicates a federally cognizable liberty interest protected by the Due Process Clause only when it "will inevitably affect the duration of his sentence" or imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id*. at 486-87.  Plaintiff does not allege that his misconduct convictions will inevitably affect the duration of his sentence, nor could he.  The Sixth Circuit has examined Michigan statutory law, as it relates to the creation and forfeiture of disciplinary credits[9] for prisoners convicted of crimes

---

[9] For crimes committed after April 1, 1987, Michigan prisoners earn "disciplinary credits" under a statute that abolished the former good-time system.  MICH. COMP. LAWS § 800.33(5).

-25-

occurring after April 1, 1987.  In *Thomas v. Eby*, 481 F.3d 434 (6th Cir. 2007), the court determined

that loss of disciplinary credits does not necessarily affect the duration of a prisoner's sentence.

Instead, it merely affects parole eligibility, which remains discretionary with the parole board.  *Id.*

at 440.  Building on this ruling, in *Nali v. Ekman*, 355 F. App'x 909 (6th Cir. 2009), the court held

that a misconduct citation in the Michigan prison system does not affect a prisoner's constitutionally

protected liberty interests, because it does not necessarily affect the length of confinement.  355 F.

App'x at 912.  Thus, Plaintiff's misconduct convictions might have caused the forfeiture of

disciplinary credits, but they do not necessarily affect the length of his sentence.

        In addition, Plaintiff does not allege an atypical and significant deprivation as a result

of his confinement in segregation.  In *Sandin*, the Court concluded that 30 days of disciplinary

segregation does not implicate a liberty interest.  *Id.* at 484.  Similarly, the Sixth Circuit has held that

placement in administrative segregation, or confinement in segregation for a relatively short period

of time, are not atypical and significant deprivations.  *Rimmer-Bey v. Brown,* 62 F.3d 789, 790-91

(6th Cir. 1995) (placement in segregation); *Joseph v. Curtin,* 410 F. App'x 865, 868 (6th Cir. 2010)

(61 days in segregation).  Here, Plaintiff alleges that Defendant Theut sanctioned him with seven,

ten, and thirty days in segregation for his respective misconducts.  Like the segregation at issue in

*Sandin*, *Rimmer-Bey,* and *Joseph*, the sanctions issued by Theut were not atypical and significant.

Consequently, in the absence of a protected liberty interest, Plaintiff cannot state a due-process

claim.

        Plaintiff apparently challenges the evidence relied upon by Theut in one of the

misconduct hearings, particularly Dr. Brostoski's statement that the facility has wheelchair-

accessible cells.  To the extent that Theut found Plaintiff guilty based on a finding that the cells are

wheelchair-accessible, however, Theut's findings have preclusive effect in this action.  *See Peterson v. Johnson*, 714 F.3d 905, 917 (6th Cir. 2013) (holding that factual findings in a Class I misconduct proceeding are entitled to preclusive effect in a subsequent federal action).  Plaintiff could have challenged the validity of Theut's findings in a state court action, *see* Mich. Comp. Laws § 791.255; he is precluded from doing so here.  *Peterson*, 714 F.3d at 914, 917.

Plaintiff's retaliation claim is not supported by any facts other than the timing of his objection to the hearing and a discrepancy between two sanctions.  Plaintiff apparently assumes that the October 2012 sanction should have been the same as his previous sanctions, but it is not surprising that Plaintiff received the longest sanction after his third misconduct conviction, when it was clear that the previous sanctions were not enough to deter him from engaging in misconduct. Thus, Plaintiff does not state a plausible § 1983 claim against Defendant Theut.

Moreover, even if Plaintiff did state a claim under § 1983, Defendant Theut would be entitled to immunity.  In *Shelly v. Johnson*, 849 F.2d 228 (6th Cir. 1988) (per curiam), the Sixth Circuit held that Michigan prison hearing officers like Defendant Theut are entitled to "absolute immunity from liability with respect to their judicial acts."  *Id.* at 229-30.  The doctrine of judicial immunity protects judicial officers from suits seeking money damages and applies even in the face of "allegations of bad faith or malice."  *Mireles v. Waco*, 502 U.S. 9, 11 (1991) (per curiam). Judicial immunity is overcome in only two circumstances:  "First, a judge is not immune from liability for nonjudicial actions, *i.e.*, actions not taken in the judge's judicial capacity.  Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction."  *Id.* at 11-12 (citations omitted).  The Supreme Court has held that "whether an act by a judge is a 'judicial' one relate[s] to the nature of the act itself, *i.e.*, whether it is a function normally

performed by a judge, and to the expectations of the parties, *i.e.*, whether they dealt with the judge in his judicial capacity." *Id.* at 12 (quoting *Stump v. Sparkman*, 435 U.S. 349, 362 (1978) (alteration in original)). Here, Defendant Theut was clearly acting in his "judicial" capacity when presiding over misconduct hearings and determining Plaintiff's sanctions.

Furthermore, as far as the ADA and RA are concerned, Plaintiff does not contend that Defendant Theut treated him any differently from other prisoners because he is disabled. Those statutes do not give disabled prisoners license to disobey orders from prison officials. Consequently, Plaintiff does not state a claim against Defendant Theut.

### E.  Hearing Officer O'Brien

Like Hearing Officer Theut, Defendant O'Brien allegedly found Plaintiff guilty of three Class I misconducts for disobeying orders to return to his cell. On all three occasions, Defendant O'Brien ordered that Plaintiff be detained in segregation for ten days, and on at least on occasion, the sanction included loss of privileges for 30 days. In addition, at one of the misconduct hearings, O'Brien allegedly determined that, contrary to Plaintiff's assertions, the cells in Round Unit are handicap and wheelchair accessible. Also, at a contraband hearing regarding Plaintiff's legal property, O'Brien determined that Plaintiff needed new footlockers to hold his legal property.

#### 1.  *Misconduct proceedings*

Just as Plaintiff does not state a claim against Defendant Theut, Plaintiff does not state a claim against Defendant O'Brien regarding the proceedings conducted by O'Brien. O'Brien imposed slightly different sanctions, but ten days in segregation and thirty days' loss of privileges is not an atypical and significant deprivation of liberty. *See, e.g.*, *Ingram v. Jewel*, 94 F. App'x 271, 273 (6th Cir. 2004) (fourteen-day loss-of-privileges sanction did not impose an atypical, significant

-28-

deprivation); *Carter v. Tucker*, 69 F. App'x 678, 680 (6th Cir. 2003) (loss of privileges and placement in segregation does not implicate a liberty interest protected by the Due Process Clause); *see also Wolff v. McDonnell*, 418 U.S. 539, 571 n.19 (1974) ("We do not suggest . . . that the procedures required . . . for the deprivation of good time would also be required for the imposition of lesser penalties such as the loss of privileges."). Plaintiff does not alleged that he was treated differently on account of his disability, for purposes of stating an ADA/RA claim.

In addition, to the extent that any of Plaintiff's misconduct convictions were dependent upon a finding that Round Unit is handicap and wheelchair accessible, Plaintiff cannot challenge that finding as a basis for bringing a claim against O'Brien in these proceedings. *See Peterson*, 714 F.3d at 917.

### 2. *Contraband hearing (legal property)*

Defendant O'Brien's decision to require Plaintiff to obtain new footlockers for his legal property had the effect of depriving Plaintiff of access to his legal property until new footlockers arrived. Plaintiff does not state a claim with regard to this deprivation because he acknowledges that he received notice and a hearing prior to O'Brien's decision; that is all the Constitutional requires. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Plaintiff implies that O'Brien's decision was incorrect as a matter of prison policy, but a violation of prison policy does not give rise to a claim in itself, and "even if a state decision . . . is erroneous, it does not necessarily follow that the decision violated the individual's right to due process." *Martinez v. California*, 444 U.S. 277, 284 n.9 (1980).

In some circumstances, a prisoner's right of access to the courts might be implicated by a lack of access to legal property, but Plaintiff does not claim that he was deprived of such access.

Indeed, he does not allege any adverse consequences as a result of the lack of access to his legal materials. In order to state a viable access-to-courts claim, Plaintiff must allege "actual injury." *Lewis v. Casey*, 518 U.S. 343, 349 (1996); *see also Talley-Bey v. Knebl*, 168 F.3d 884, 886 (6th Cir. 1999). In other words, he must plead facts demonstrating that the lack of access to his materials prejudiced him in his efforts to pursue a nonfrivolous legal claim. *Lewis*, 518 U.S. at 351-53; *see also Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996). "Examples of actual prejudice to pending or contemplated litigation include having a case dismissed, being unable to file a complaint, and missing a court-imposed deadline." *Harbin-Bey*, 420 F.3d at 578 (citing *Jackson v. Gill*, 92 F. App'x 171, 173 (6th Cir. 2004)). In addition, the Supreme Court squarely has held that "the underlying cause of action . . . is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002) (citing *Lewis*, 518 U.S. at 353 & n.3). "Like any other element of an access claim, the underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give fair notice to a defendant." *Id.* at 416.

Plaintiff does not allege that the lack of access to his legal materials caused him actual injury to pending or contemplated litigation. Nor does he identify an underlying cause of action as required by *Christopher*. Thus, Plaintiff fails to state a claim against Defendant O'Brien.[10]

### F. Dr. Brostoski

Dr. Brostoski allegedly told Defendant Theut that Plaintiff did not need to be housed in a single-person cell. Also, Dr. Brostoski took Plaintiff's wheelchair gloves and the clothing that

---

[10]In addition, as a hearing officer acting in his judicial capacity, Defendant O'Brien is immune from a claim for damages under § 1983.

he uses (i.e., shoes, leg socks, dressing) to wear his leg braces, ostensibly because he determined that Plaintiff did not need them.

Dr. Brostoski's statement at Plaintiff's misconduct proceedings does not give rise to a claim, nor does Dr. Brostoski's decision to deprive Plaintiff of wheelchair gloves and the dressing used for his leg braces. The Eighth Amendment obligates prison authorities to attend to the medical needs of incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001). A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer*, 511 U.S. at 834. To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a "substantial risk of serious harm." *Id.*

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer,* 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. Plaintiff does not allege that his leg braces were medically necessary or that Dr. Brostoski's actions subjected him to an objectively serious risk of harm.

To the extent that Dr. Brostoski deprived Plaintiff of his personal property, Plaintiff does not state a due process claim. Under *Parratt v. Taylor*, 451 U.S. 527 (1981), a person deprived of property by a "random and unauthorized act" of a state employee has no federal due process claim unless the state fails to afford an adequate post-deprivation remedy. If an adequate post-deprivation remedy exists, the deprivation, although real, is not "without due process of law." *Id.* at 537. This rule applies to both negligent and intentional deprivation of property, as long as the deprivation was not done pursuant to an established state procedure. *See Hudson v. Palmer*, 468 U.S. 517, 530-36 (1984). Because Plaintiff's claim is premised upon a random act of a state official, he must plead and prove the inadequacy of state post-deprivation remedies. *See Copeland v. Machulis*, 57 F.3d 476, 479-80 (6th Cir. 1995); *Gibbs v. Hopkins*, 10 F.3d 373, 378 (6th Cir. 1993). Under settled Sixth Circuit authority, a prisoner's failure to sustain this burden requires dismissal of his § 1983 due-process action. *See Brooks v. Dutton*, 751 F.2d 197 (6th Cir. 1985). Plaintiff does not allege that post-deprivation remedies are inadequate; thus, he has not sustained his burden.

Moreover, Plaintiff does not state an ADA/RA claim against Brostoski because he does not allege that Brostoski discriminated against him on account of his disability. While it appears that Dr. Brostoski may have deprived Plaintiff of wheelchair gloves and the clothing Plaintiff needed to use his leg braces, Plaintiff does not allege that the loss of this property denied him access to, or prevented him from participating in or receiving the benefit of, a program, service or activity otherwise available to him. Indeed, he acknowledges that he was provided a wheelchair and the assistance of a wheelchair-pusher for the purpose of navigating the prison. He does not allege any circumstances in which the possession of leg braces and wheelchair gloves would have allowed him to access to a program, service or activity of the prison that was otherwise unavailable.

### G.  Warden Woods

Defendant Woods, the warden at Chippewa, allegedly denied Plaintiff's grievance about the fact that some of Plaintiff's personal property was not identified on his property list when his property was packed up for transfer from Chippewa to Alger.  Woods also allegedly refused to reclassify Plaintiff's security level from Level II to Level I, because there were no wheelchair-accessible cells available at Level I.

#### 1.  *Denial of grievance*

The denial of a prisoner grievance does not give rise to a constitutional claim. Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability.  *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009).  A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002).  The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act.  *Grinter*, 532 F.3d at 575; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004).  Thus, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance.  *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).

Plaintiff claims that Woods "lied and violated policy" by denying the grievance, but even if that is the case, Woods did not violate Plaintiff's constitutional rights.  The Sixth Circuit and other circuit courts have held that there is no constitutionally protected due process right to an effective prison grievance procedure.  *Walker v. Mich. Dep't of Corr.,* 128 F. App'x 441, 445 (6th

Cir. 2005); *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003); *Young v. Gundy,* 30 F. App'x 568, 569-70 (6th Cir. 2002); *Carpenter v. Wilkinson,* No. 99-3562, 2000 WL 190054, at *2 (6th Cir. Feb. 7, 2000); *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994).   Michigan law does not create a liberty interest in the grievance procedure.  *See Olim,* 461 U.S. at 249; *Keenan v. Marker*, 23 F. App'x 405, 407 (6th Cir. 2001); *Wynn v. Wolf*, No. 93-2411, 1994 WL 105907, at *1 (6th Cir. Mar. 28, 1994).  Because Plaintiff has no liberty interest in the grievance process, Defendant's conduct did not deprive him of an interest protected by the Fourteenth Amendment.

Furthermore, an alleged failure to comply with an administrative rule or policy does not itself rise to the level of a constitutional violation.  *Laney v. Farley*, 501 F.3d 577, 581 n.2 (6th Cir. 2007); *Smith v. Freland*, 954 F.2d 343, 347-48 (6th Cir. 1992); *Barber v. City of Salem*, 953 F.2d 232, 240 (6th Cir. 1992); *McVeigh v. Bartlett*, No. 94-23347, 1995 WL 236687, at *1 (6th Cir. Apr. 21, 1995) (failure to follow policy directive does not rise to the level of a constitutional violation because policy directive does not create a protectible liberty interest).  Section 1983 is addressed to remedying violations of federal law, not state law.  *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982); *Laney*, 501 F.3d at 580-81.

## 2.  *Security classification*

Woods' refusal to reclassify Plaintiff also does not state a § 1983 claim.  As indicated, Plaintiff does not have a constitutional right to be incarcerated in a particular facility or to be held in a specific security classification.  *See Olim*, 461 U.S. at 245; *Moody*, 429 U.S. at 88 n.9; *Meachum*, 427 U.S. at 228-29; *Harris*, 79 F. App'x at 759.  Nor does Plaintiff have a right to due process in connection with being reclassified to Level II security, as he does not allege facts

indicating that his increased security classification imposed an "atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." *See Sandin*, 515 U.S. at 484.

On the other hand, Plaintiff states a possible ADA/RA claim against Woods regarding his refusal to reclassify Plaintiff to Level I or to transfer Plaintiff to another facility. *See* 28 C.F.R. § 35.152(b)(2)(i) (providing that public entitles may not "place inmates or detainees with disabilities in inappropriate security classifications because no accessible cells or beds are available," "[u]nless it is appropriate to make an exception").

### H.  Deputy Warden Mackie

Defendant Mackie allegedly participated in several security classification hearings for Plaintiff, after he was convicted of misconducts for refusing to return to his housing unit.  At several such hearings, Mackie informed Plaintiff that he would be reclassified to a higher security level if he did not return to his housing unit.  Eventually, Mackie reclassified Plaintiff to Level IV, which required him to be moved to Round Unit.  When Plaintiff refused to go to Round Unit, Mackie told him that he must go "or die at Marquette." (Compl., docket #1-1, Page ID#37.)  Mackie stated that Plaintiff would never be transferred to another facility.  In addition, Mackie told Plaintiff that he would be allowed to access his legal footlockers only once a month, after a written request.

#### 1.  *Security classification*

Mackie's decision to reclassify Plaintiff to Level IV for repeatedly disobeying orders did not violate Plaintiff's constitutional rights.  As indicated *supra* with respect to Defendants Krick and Woods, Plaintiff does not have a constitutional right to be housed in a specific security classification or location within the prison system.

Plaintiff asserts that he feared for his safety in Level IV because another inmate in Round Unit who was confined to a wheelchair was beaten to death by his cell-mate.  The Eighth Amendment requires prison staff "to take reasonable measures to guarantee the safety of the inmates" in their care. *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984); *see also Farmer*, 511 U.S. at 833 ("[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners.").  To establish a violation of this right, Plaintiff must show that he was exposed to a "substantial risk of serious harm" and that Defendant Mackie was deliberately indifferent to this risk. *See Farmer*, 511 U.S. at 834; *see also Walker v. Norris*, 917 F.2d 1449, 1453 (6th Cir. 1990); *McGhee v. Foltz*, 852 F.2d 876, 880-81 (6th Cir. 1988).  While a prisoner does not need to prove that he has been the victim of an actual attack to bring a claim, he must at least establish that he reasonably fears such an attack. *Thompson v. Cnty. of Medina*, 29 F.3d 238, 242-43 (6th Cir. 1994) (holding that plaintiff has the minimal burden of "showing a sufficient inferential connection" between the alleged violation and inmate violence to "justify a reasonable fear for personal safety").

Plaintiff alleges no facts from which to infer that inmates in Plaintiff's condition were more likely to be harmed in Round Unit, let alone that Mackie was aware of and deliberately indifferent to such a risk.  Plaintiff asserts that one reason for the attack was that the attacker thought that his cell mate "stinks." (Compl., Page ID#36.)  Plaintiff asserts that he also "stinks" because he wears an undergarment (*id.*); however, a single attack by one particular prisoner on his cell mate does not translate into a substantial risk of harm for all other prisoners in the unit who share similar characteristics with the victim.

In addition, Mackie's statement that Plaintiff must return to Round Unit or "die" at Marquette, which Plaintiff claims was a death threat, and Mackie's statement that Plaintiff would

-36-

never be transferred to another facility, are not sufficient to state a claim.  Statements by prison officials are generally not sufficient in themselves to give rise to a constitutional claim.  *See Ivey v. Wilson*, 832 F.2d 950, 954-55 (6th Cir. 1987); *see also Johnson v. Dellatifa*, 357 F.3d 539, 546 (6th Cir. 2004) (harassment and verbal abuse do not constitute the type of infliction of pain that the Eighth Amendment prohibits); *Violett v. Reynolds,* No. 02-6366, 2003 WL 22097827, at *3 (6th Cir. Sept. 5, 2003) (verbal abuse and harassment do not constitute punishment that would support an Eighth Amendment claim); *Thaddeus-X v. Langley*, No. 96-1282, 1997 WL 205604, at *1 (6th Cir. Apr. 24, 1997) (verbal harassment is insufficient to state a claim); *Murray v. U.S. Bureau of Prisons*, No. 95-5204, 1997 WL 34677, at *3 (6th Cir. Jan. 28, 1997) ("Although we do not condone the alleged statements, the Eighth Amendment does not afford us the power to correct every action, statement or attitude of a prison official with which we might disagree.").

Plaintiff contends that Mackie's statements and decision to increase his security level constitute retaliation in violation of the ADA/RA.  "Both the ADA and the RA prohibit retaliation against any individual because of his or her opposing practices made unlawful by the Acts or otherwise seeking to enforce rights under the Acts."  *A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 696 (6th Cir. 2013) (citing 42 U.S.C. § 12203 and 28 C.F.R. § 35.134 (ADA); 29 U.S.C. § 794(a) and 29 C.F.R. § 33.13 (RA)).  "The Acts have a similar scope and aim; for purposes of retaliation analysis, cases construing either Act are generally applicable to both."  *Id.* at 697.  To state a claim, Plaintiff must allege that: (1) he engaged in an activity protected by the Acts; (2) the defendant took adverse action against him; and (3) there is a causal link between his protected activity and the adverse action.  *See id.*

In Plaintiff's case, the allegations clearly indicate that Mackie's statements and actions were motivated by Plaintiff's refusal to obey orders, not Plaintiff's complaints about his cell conditions, or any other protected conduct. Mackie expressly warned Plaintiff that his security level would be increased if he did not comply with orders to return to his unit. Plaintiff was then convicted of two more misconducts for disobeying orders and, as promised, Mackie increased his security level. When Plaintiff again refused to go to his unit, Mackie told him that he would have to go to Round Unit or "die" in Marquette. Refusing to comply with the orders of a prison officer is not itself protected conduct; it is not a legitimate means of opposing practices made unlawful by the ADA/RA or of enforcing rights under those statutes. *See Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 814 (6th Cir. 1999) ("[I]t was incumbent upon appellant to challenge [the board's] actions through legal recourse, as appellant had done in the past, and not to engage in misconduct and insubordination to enforce his rights.") (alterations in original).

Plaintiff implies that Mackie discriminated against him because, during the time that Plaintiff's security classification increased to Level IV, non-disabled prisoners who refused to house in Marquette Unit and Round Unit were transferred to other prison facilities. Plaintiff offers no allegations to support a plausible claim against Mackie, however. He does not identify any inmates who were transferred, the circumstances in which those transfers occurred, or Mackie's role in the transfer process.

### 2. *Legal property*

It is not clear whether Plaintiff actually complied with Defendant Mackie's direction

to submit a written request for access to his legal property,[11] but in any event, Plaintiff alleges no consequences as a result of being denied access to his legal property for a period of time.  He does not allege that he suffered "actual injury" to a non-frivolous legal claim.  *See Lewis*, 518 U.S. at 349. Nor does he allege that he was treated differently due to his disability.  Thus, he does not state a claim against Mackie.

### I.  Deputy Warden Horton

Defendant Horton participated in the security classification hearings with Defendant Mackie.  For the same reasons that Plaintiff does not state a claim against Defendant Mackie regarding the security classification proceedings, Plaintiff does not state a claim against Defendant Horton.

### J.  RUM Norton

In May 2012, Defendant Norton allegedly disposed of some of Plaintiff's personal and medical property after a contraband hearing that did not comply with prison policy.  In August 2012, Norton confiscated some of Plaintiff's property when Plaintiff moved from Level II to Level IV; that property was lost and never made it to Alger.  In October 2012, Norton told Plaintiff that he would "never go home," and he would "die in prison," after Norton discovered that Plaintiff was preparing a complaint about his prison conditions.  Later, Norton denied Plaintiff's grievance about a missing package that Plaintiff had received from his family.

Defendant Norton's statements to Plaintiff do not constitute punishment within the meaning of the Eighth Amendment.  *Ivey*, 832 F.2d at 954-55; *Johnson*, 357 F.3d at 546.  Also, they

---

[11]Plaintiff's allegations suggest that he requested access directly from the officers in his unit, rather than sending a kite, because the officers told him to return to his cell.

are not sufficiently adverse to state a plausible retaliation claim under the First Amendment. The adverseness inquiry is an objective one, and does not depend on how a particular plaintiff reacted. The relevant question is whether the defendants' conduct is "*capable* of deterring a person of ordinary firmness"; the plaintiff need not show actual deterrence. *Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002) (emphasis in original). A specific threat of harm may satisfy the adverse-action requirement if it would deter a person of ordinary firmness from exercising his or her First Amendment rights, *see, e.g., Thaddeus-X*, 175 F.3d at 396, 398 (threat of physical harm); *Smith v. Yarrow*, 78 F. App'x 529, 542 (6th Cir. 2003) (threat to change drug test results). However, certain threats or deprivations are so *de minimis* that they do not rise to the level of being constitutional violations. *Thaddeus-X*, 175 F.3d at 398; *Smith*, 78 F. App'x at 542. Norton was clearly upset by Plaintiff's complaint, but his statements were not adverse in themselves and did not threaten any meaningful harm. Plaintiff does not allege any circumstances in which Norton could ensure that Plaintiff would never be released from prison; indeed, Plaintiff was transferred to another facility (away from Norton) only three days later. Thus, Norton's statements do not give rise to a claim.

To the extent Plaintiff claims that Norton deprived him of property in retaliation for protected conduct, there is no plausible connection alleged in the complaint between these deprivations and any protected conduct. Thus, Plaintiff does not state a retaliation claim against Norton. Furthermore, Plaintiff does not state a due process claim. Because Plaintiff alleges an unauthorized deprivation at a non-compliant hearing in one instance, and a random/negligent deprivation of property in another, Plaintiff must plead that post-deprivation remedies provided by the state are inadequate. *See Hudson*, 468 U.S. at 533; *Copeland*, 57 F.3d at 479-80. He has not done so.

Furthermore, Norton's allegedly improper rejection of Plaintiff's grievance does not give rise to a claim because a violation of state law or prison policy is not equivalent to a violation of Plaintiff's constitutional rights, and Plaintiff lacks a protected interest in an effective grievance procedure. *Walker,* 128 F. App'x at 445; *Argue,* 80 F. App'x at 430. Thus, for purposes of stating a § 1983 claim, Norton's rejection of the grievance is of no constitutional significance. Similarly, Plaintiff does not state an ADA/RA claim against Norton, because there is no allegation that Norton engaged in any conduct that would violate those statutes.

### K. Property Room Officer Smith

Smith determined that Plaintiff's personal and legal property needed to be evaluated for contraband at contraband hearings, and he sent Plaintiff's medical property to the medical unit. Smith also destroyed some of Plaintiff's typewriter ribbons by unsealing them and allowing them to dry out. In addition, Plaintiff lost some property when he moved to Alger, and he implies that Defendant Smith is responsible for the loss, because Smith stated that Plaintiff would be "glad" to have "half a duff[el] bag" of property. (Compl., Page ID#48.)

Regarding the property held for review as contraband and the property sent to the medical unit, Plaintiff does not state a claim because Smith merely referred this property to another officer for review; he was not responsible for its final disposition. Plaintiff claims that Smith misapplied policy when determining that some property might be contraband, but a misapplication of prison policy does not itself give rise to a federal claim. *Laney,* 501 F.3d at 581 n.2; *McVeigh,* 1995 WL 236687, at *1. Moreover, Plaintiff had an opportunity to challenge the contraband notice at a hearing; thus, the notice itself did not deprive Plaintiff of any rights.

Regarding the destruction of Plaintiff's typewriter ribbons and the property that went missing when Plaintiff transferred to Alger, these losses were negligent and/or "unauthorized intentional" deprivations of property that do not violate the Due Process Clause unless the state failed to provide an adequate post-deprivation remedy. *Hudson*, 468 U.S. at 533. Plaintiff does not allege that state post-deprivation remedies were inadequate to remedy his losses; thus, he does not state a due process claim. *See Copeland*, 57 F.3d at 479-80. For the foregoing reasons, Plaintiff does not state a § 1983 claim against Defendant Smith. Also, there are no facts alleged that would state an ADA/RA claim against Smith.

### L.  Hearing Investigator ("Unknown Party #2")

An unidentified hearing investigator at Chippewa allegedly violated prison policy by failing to meet with Plaintiff within two days after Defendant Smith issued a contraband removal notice for Plaintiff's legal property. Also, the hearing investigator allegedly allowed the contraband hearing to proceed rather than resolve the matter with Plaintiff, despite the fact that the property complied with policy. As indicated *supra*, a violation of prison policy does not in itself give rise to a § 1983 claim. Moreover, though the hearing investigator did not resolve the contraband charge, Plaintiff had an opportunity to challenge that charge at a hearing before Defendant O'Brien. *See* Section III.H *supra*. Thus, the hearing investigator did not deprive Plaintiff of his right to due process or any other constitutional rights. Nor did he violate the ADA/RA.

### M.  Librarian ("Unknown Party #3")

An unidentified librarian at Chippewa allegedly took Plaintiff's audio book players and put them in the library, for no reason. Plaintiff does not have a constitutional right to keep audio book players in his cell, and to the extent that the librarian deprived Plaintiff of his personal property,

-42-

he does not allege that state post-deprivation remedies were inadequate to remedy this loss.  In addition, Plaintiff does not allege that the librarian discriminated against him on account of his disability or that the players are necessary to provide access to programs, services or benefits of the facility that are available to other, non-disabled prisoners.  Thus, he does not state a claim against the librarian.

### N.  Grievance Coordinator Trierweiler

Defendant Trierweiler allegedly refused to accept grievances that Plaintiff attempted to file regarding his lost property, even though the grievances complied with prison policies.  When Plaintiff attempted to comply with Defendant's specific instructions about filing a proper grievance, the grievance was rejected.  When Plaintiff attempted to file it at the next level of the grievance process, he did not receive a response.  Defendant Trierweiler's alleged misapplication of prison policy does not state a constitutional claim.  Moreover, as indicated *supra*, Plaintiff does not have a protected right to an effective grievance procedure; thus, Defendant Trierweiler's improper rejection of, or failure to respond to, Plaintiff's grievances did not violate Plaintiff's due process rights.  Consequently, Plaintiff does not state a claim against Defendant Trierweiler.

### O.  ARUS Schram

Defendant Schram allegedly refused to correct errors and inconsistencies in Plaintiff's prison record.  These errors, Plaintiff claims, will adversely affect his ability to obtain early release on parole.  Prisoners do not have an absolute constitutional right to the removal of inaccurate information from their files.  *Carson v. Little*, 1989 WL 40171, at *1 (6th Cir. April 18, 1989) ("[T]he mere retention of inaccurate information in an inmate's file does not amount to a constitutional violation.") (citing *Pruett v. Levi*, 622 F.2d 256, 258 (6th Cir. 1980) (per curiam)).

Moreover, Plaintiff does not have a constitutional right to be conditionally released on parole before the expiration of his prison sentence. *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979). Although a state may establish a parole system, it has no duty to do so; thus, the presence of a parole system by itself does not give rise to a constitutionally protected liberty interest in parole release. *Id.* at 7, 11; *Bd. of Pardons v. Allen*, 482 U.S. 369, 373, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987). Rather, a liberty interest is present only if state law entitles an inmate to release on parole. *Inmates of Orient Corr. Inst. v. Ohio State Adult Parole Auth.*, 929 F.2d 233, 235 (6th Cir. 1991). In *Sweeton v. Brown*, 27 F.3d 1162, 1164-65 (6th Cir.1994) (en banc), the Sixth Circuit, noting "the broad powers of the Michigan authorities to deny parole," held that the Michigan system does not create a liberty interest in parole. The Sixth Circuit reiterated the continuing validity of *Sweeton* in *Crump v. Lafler*, 657 F.3d 393 (6th Cir. 2011), holding that the adoption of specific parole guidelines since *Sweeton* does not lead to the conclusion that parole release is mandated upon reaching a high probability of parole. *See id.* at 404.

Because Plaintiff has no constitutional right to the removal of errors in his prison record, and no liberty interest in parole, he cannot complain that Defendant Schram's refusal to correct those errors violated his constitutional rights. *See Caldwell v. McNutt*, 158 F. App'x 739, 741 (6th Cir. 2006) (rejecting § 1983 claim against an ARUS for providing inaccurate information to the Michigan Parole Board, because the prisoner "has no constitutionally-protected liberty interest in the granting of parole or the following of parole procedures"). Plaintiff's contention that Schram's conduct was retaliatory is wholly conclusory. Thus, he fails to state a claim against Defendant Schram.

### P. Defendants Brown, Ives and O'Connor

At this stage of the proceedings, the Court concludes that Plaintiff's complaint states a possible retaliation and/or ADA/RA claim against Defendants Brown, Ives and O'Connor, who allegedly removed many of the special accommodations for his disability, including his accommodation for barrier-free housing, which was removed shortly after he complained to Deputy Warden Brown about Sumner.

### IV.   General allegations

In addition to the allegations involving specific Defendants, which are discussed in the previous Section, Plaintiff's complaint contains a variety of other allegations that do not clearly involve any of the individuals named as Defendants in this action.  For instance, Plaintiff claims that: (1) he was deprived of his medical menu and medications for a period of time at Carson City and Chippewa; (2) he was forced to reuse a full undergarment overnight at Chippewa, and unidentified officers refused to provide a new undergarment or let him obtain one from the medical unit; (3) he was harassed and called names by unidentified staff in Marquette Unit before he was placed in segregation; (4) his request for a transfer from Chippewa was denied; (5) unidentified staff at Chippewa lost his walker, told him that he needed to have his audio players inspected, would not respond to his requests for access to his legal footlockers, and denied him paper; (6) mailroom staff at Alger prevented from sending a postage-free letter; and (7) unidentified staff at Alger would not provide specific underwear to prevent his sanitary pad from leaking and provided him with boots that do not work with his leg braces.  Also, Plaintiff claims that the facilities where he was housed, particularly Chippewa, do not comply with ADA regulations for the design of wheelchair-accessible facilities.  *See, e.g.*, 28 C.F.R. § 35.152(b)(3) (requiring prison facilities to implement "reasonable

policies, including physical modifications to additional cells in accordance with the 2010 Standards, so as to ensure that each inmate with a disability is housed in a cell with the accessible elements necessary to afford the inmate access to safe, appropriate housing").

These allegations are not sufficient to state a § 1983 claim against any of the named Defendants.  It is a basic pleading essential that a plaintiff attribute factual allegations to particular defendants.  *See Twombly*, 550 U.S. at 544 (holding that, in order to state a claim, a plaintiff must make sufficient allegations to give a defendant fair notice of the claim); *Frazier v. Michigan*, 41 F. App'x 762, 764 (6th Cir. 2002) (dismissing plaintiff's claims where the complaint did not allege with any degree of specificity which of the named defendants were personally involved in or responsible for each alleged violation of rights); *Griffin v. Montgomery*, No. 00-3402, 2000 WL 1800569, at *2 (6th Cir. Nov. 30, 2000) (requiring allegations of personal involvement against each defendant); *Rodriguez v. Jabe*, No. 90-1010, 1990 WL 82722, at *1 (6th Cir. June 19, 1990) ("Plaintiff's claims against those individuals are without a basis in law as the complaint is totally devoid of allegations as to them which would suggest their involvement in the events leading to his injuries").  Defendants may not be held liable under § 1983 for the unconstitutional conduct of other officers under a theory of respondeat superior or vicarious liability.  *See Iqbal*, 556 U.S. at 676 ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").  Plaintiff has not alleged any involvement by any of the named Defendants in the conduct or conditions mentioned in this Section.  Consequently, they are not sufficient to state a claim under § 1983.

On the other hand, at this stage of the proceedings, the Court concludes that the allegations mentioned in this Section, particularly those that concern the allegedly inadequate

conditions of confinement at Chippewa, suffice to state a claim against the MDOC or the State of Michigan under the ADA/RA. Plaintiff does not expressly name the MDOC or the State of Michigan as a separate defendant, but all of his official-capacity claims against MDOC employees are essentially claims against the State of Michigan. *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978) ("[O]fficial-capacity suits . . . represent only another way of pleading an action against an entity of which an officer is an agent."); *Mingus*, 591 F.3d at 482 ("It is undisputed that since [the defendant, a state correctional facility's health unit manager] has been sued in her official capacity, [the plaintiff prisoner's] ADA claim is, for all intents and purposes, against the state of Michigan as the real party-in-interest."). Thus, to the extent that the allegations in this Section state an ADA/RA claim, that claim may proceed against Defendants Brown, Ives, Krick, Woods, and/or the unidentified first shift sergeant at Parnall, in their official capacities. Consequently, the Court will dismiss Defendants Brostoski, Mackie, Marran, Horton, Norton, O'Brien, Schram, Smith, Theut, Trierweiler, the unknown hearing investigator at Chippewa, and the unknown librarian at Chippewa.

### Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Defendants Brostoski, Mackie, Marran, Horton, Norton, O'Brien, Schram, Smith, Theut, Trierweiler, the unknown hearing investigator at Chippewa, and the unknown librarian at Chippewa will be dismissed for failure to state a claim pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court will also dismiss Plaintiff's claims under § 1983 against Defendants Krick, Woods, and the unknown party identified as a first shift sergeant at Parnall, but will allow claims under the ADA/RA to proceed against these Defendants (in their

official capacities only).  Also, the Court will allow the action to proceed under § 1983 and the

ADA/RA against Defendants Brown, O'Connor, and Ives.

An Order consistent with this Opinion will be entered.


Dated:  June 26, 2014                                   /s/ Paul L. Maloney
                                                        Paul L. Maloney
                                                        Chief United States District Judge